IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SIMON WILLIAMS, as Guardian
Ad Litem for Malcom Williams,

                Plaintiff,                    3:12-cv-01385-PK

v.                                 FINDINGS AND
                                 RECOMMENDATION

KOHL'S DEPARTMENT STORES,
INC., a business corporation,

                Defendant.

PAPAK, Magistrate Judge:

Plaintiff Simon Williams, as guardian ad litem for Malcom Williams,[1] brings this action

against defendant Kohl's Department Stores, Inc. ("Kohl's") alleging that Kohl's denied plaintiff

services and improperly detained him on account of his race.  Now before the court are plaintiff's

motion for imposition of sanctions (#37), plaintiff's motion to amend the memorandum in

---

[1] "Plaintiff," as used herein, refers to Malcom Williams.

support of the motion for imposition of sanctions (#52), plaintiff's motion for partial summary

judgment (#63), and defendant's motion for summary judgment (#71).  For the reasons described

below, plaintiff's motion to amend the memorandum in support of the motion for imposition of

sanctions is granted and the district court should grant in part and deny in part plaintiff's motion

for imposition of sanctions, grant in part and deny in part defendant's motion for summary

judgment, and grant in part and deny in part plaintiff's motion for partial summary judgment.

## FACTUAL BACKGROUND[2]

**I.    Players**

Plaintiff is an African American male who, on June 6, 2012, was thirteen years old.

"Kohl's is a national retailer with stores across the United States[,] including one in Clackamas,

Oregon."  Kohl's Memo. in Support of Motion for Summary Judgment, #72, at 1.  On June 6,

2012, Cindy Isom was employed as a loss-prevention officer by Kohl's.  On June 6, 2012, Ryan

Myers was employed as a loss-prevention officer/trainee by Kohl's.

**II.    Kohl's Shoe Return Policy**

Under Kohl's shoe return policy, a customer may return unworn shoes either with or

without a receipt.  Ex. 1, Declaration of Clarence M. Belnavis ("Belnavis Decl."), #73-1, at 5.  If

the customer has a receipt, the customer may receive a refund, exchange the shoes, or return the

shoes for store credit, also known as Kohl's Merchandise Credit ("KMC").  *Id.* at 1, 5; Ex. 2,

Belnavis Decl., #73-2, at 1.  If, however, the customer does not have a receipt, the customer may

only exchange the shoes or return the shoes for KMC.  Ex. 1, Belnavis Decl., #73-1, at 5.

/ / /

---

[2]  The following facts are undisputed unless otherwise noted.

III.    **Kohl's Video-Surveillance System**

In its Clackamas store, Kohl's uses a video-surveillance system that records video from over thirty[3] cameras located throughout the store to two digital video recorders ("DVR") located in the security office.  Ex. X, Klingbeil Decl., #39, at 5-9; Ex. A, Klingbeil Decl., #64, at 27.  Some of the cameras are "fixed" and others are capable of panning, tilting, and zooming using controls in the security office.  Ex. X, Klingbeil Decl., at 8.  Video can be viewed "live" using monitors located in the security office.  *Id.* at 9-10.  A user can also view historical video footage saved on the DVRs by inputting a date, time, and camera.  *Id.* at 9.  After a certain amount of time, video saved on the DVRs is automatically overwritten with new footage.  *Id.* at 12.  A user wishing to avoid footage being overwritten can preserve it by burning the footage to a DVD.  Ex. A, Klingbeil Decl., #64, at 30.

IV.    **June 6, 2012 Incident**

On June 6, 2012, plaintiff received a pair of tangerine Converse All Star shoes from his school as an award for academic achievement.  Ex. 2, Declaration of Alyssa R. Engelberg ("Engelberg Decl."), #49-2, at 35-36.  Approximately seventy to eighty other students received the award.  *Id.* at 36.  Plaintiff's principal gave him a document that the principal described as an "[o]nline receipt" showing a large order of the shoes from Kohl's.  Ex. D, Klingbeil Decl., #83, at 36, 38.  Later that day, plaintiff's school authorized students who had parental permission to leave early to attend the Rose Festival.  Ex. 2, Engelberg Decl., #49-2, at 29-30.  Plaintiff and his friend, Xzavier Jones, left school and took public transportation to the Clackamas Town Center

---

[3]  Jean Hilliard testified that there were thirty-one cameras, while James Tuscow testified that there were thirty-two.  *Compare* Ex. X, Declaration of Rick Klingbeil ("Klingbeil Decl."), #39, at 7, *with* Ex. V, Klingbeil Decl., #39, at 50.

Mall.  *Id.* at 32-33.  Plaintiff was carrying a duffel bag and Jones was carrying a backpack.  *Id.* at

41; Ex. 17, Engelberg Decl., #49-17, at 54-55.  After plaintiff and Jones arrived at the Clackamas

Town Center Mall, they proceeded to the food court, where they purchased food.  Ex. 2,

Engelberg Decl., #49-2, at 43.  After leaving the food court, plaintiff and Jones crossed the street

to Kohl's.  *Id.* at 44.  They entered the store through the main entrance and asked a cashier where

the customer-service desk was located.  *Id.*  The cashier pointed plaintiff and Jones in the proper

direction.  *Id.* at 44-45.

      The surveillance camera located over the customer-service desk shows that plaintiff and

Jones first approached the desk shortly after 2:30 p.m.  Camera 1 at 2:31:04.  The associate on

duty, Holli Smith, was assisting another customer and, thus, plaintiff and Jones waited in line.

Ex. 2, Engelberg Decl., #49-2, at 45; Camera 1 at 2:31:03 to 2:31:36.  When it was his turn,

plaintiff opened his duffel bag and retrieved the box of tangerine Converse shoes.  Ex. 2,

Engelberg Decl., #49-2, at 45; Camera 1 at 2:31:27 to 2:31:38.  Plaintiff placed the box of

tangerine Converse shoes on the counter and asked Smith, "'Could I exchange these shoes?'"  Ex.

2, Engelberg Decl., #49-2, at 45; Camera 1 at 2:31:38.  Smith responded, "'Yes, you can,'" and

then asked plaintiff if he had a receipt.  Ex. 2, Engelberg Decl., #49-2, at 45.  Plaintiff handed

Smith the document his principal had described as an online receipt.  *Id.*; Camera 1 at 2:31:57.

Smith stated, "'We can't give you your money back, but you can exchange your shoes for a

different kind.'"  Ex. 2, Engelberg Decl., #49-2, at 45.  Plaintiff stated that he would leave the

box of tangerine Converse shoes at the customer-service counter while he looked for different

shoes.  *Id.*  Plaintiff's interaction with Smith is captured on Camera 1, which is located over the

customer-service desk.  Camera 10, which is a camera capable of panning, tilting, and zooming

to capture different areas of the store (a "PTZ camera"), was pointed in the direction of the customer-service desk and plaintiff and Jones are partially visible on that camera as well. *See* Camera 10 at 14:34:00.[4]  After they left the customer-service desk, plaintiff and Jones proceeded toward the shoe department.  Ex. 2, Engelberg Decl., #49-2, at 47; Camera 10 at 14:35:17 to 14:36:15.

There is a factual dispute as to when Isom and Myers, Kohl's loss-prevention officers, first began surveilling plaintiff and Jones.  Plaintiff alleges that Myers, who was in the security office operating the camera equipment, began surveilling plaintiff and Jones before they left the customer-service desk, as evidenced by the fact that Camera 10, a PTZ camera, was positioned such that it captured plaintiff and Jones while they were standing at the customer-service desk. Kohl's, however, contends that its loss-prevention officers first took note of plaintiff and Jones as they "were just getting ready to go into shoes, . . . they were next to the shoe display in the center aisle."  Ex. 7, Belnavis Decl., #73-7, at 38.  In her deposition, Isom stated that she first noticed plaintiff and Jones because of their "big bags" and they were "going into the high theft department."  *Id.*  Isom, who was on the floor, called Myers and instructed him to watch plaintiff and Jones from the security office.  *Id.*  Myers testified that, at the time Isom called, he had just taken note of plaintiff and Jones and was using Camera 10 to follow plaintiff and Jones's movements.  Ex. 8, Belnavis Decl., #73-8, at 43; *see also* Camera 10 at 14:35:33.  In his deposition, Myers stated that he began to watch plaintiff and Jones because they were "[t]wo

---

[4]  There appears to be a slight discrepancy between the time stamps on Camera 1 and Camera 10.  Camera 1 shows plaintiff and Jones leaving the customer-service desk at approximately 2:32:21, whereas Camera 10 shows plaintiff and Jones leaving the customer-service desk at approximately 14:35:07.

Page 5 - FINDINGS AND RECOMMENDATION

juveniles with backpacks in the middle of the day, going into a high-theft area." Ex. 8, Belnavis Decl., #73-8, at 39.

Meanwhile, as Isom and Myers observed them, plaintiff and Jones browsed the shoe selection. *See, e.g.*, Camera 10 at 14:36:15. Plaintiff selected a black shoe box with a tan lid. Camera 10 at 14:38:45 to 14:39:20. While carrying that shoe box, plaintiff, along with Jones, proceeded to a Nike sandal display in a center aisle. Camera 10 at 14:30:20; *see also* Ex. 2, Engelberg Decl., #49-2, at 48 (noting that he found Nike sandals). Plaintiff summoned a Kohl's employee for assistance with the sandals. Camera 10 at 14:39:47. As the employee helped him, plaintiff set down the shoe box he had initially selected on a counter near the shoe department. *Id.* at 14:39:47 to 14:40:33. Plaintiff ultimately selected a pair of Nike sandals, which were in a tan box. *Id.* at 14:41:18. Plaintiff and Jones then returned to the shoe department, where plaintiff selected a pair of athletic socks. *Id.* at 14:41:51. As they left the shoe department, plaintiff handed the tan box containing the Nike sandals to Jones. *Id.* at 14:41:57. Plaintiff and Jones then walked to the athletic department, where plaintiff selected a pair of shorts. *Id.* at 14:42:10 to 14:42:44. With the Nike sandals, socks, and shorts in hand, plaintiff and Jones returned to the customer-service desk. *Id.* at 14:42:56; *see also* Camera 1 at 2:40:21.

While plaintiff and Jones shopped, Isom and Myers continued to observe them. Ex. 7, Belnavis Decl., #73-7, at 41-44; Ex. 8, Belnavis Decl., #73-8, at 43-44. At some point, Isom left the floor and went to the security office. Ex. 7, Belnavis Decl., #73-7, at 43-44; Ex. 8, Belnavis Decl., #73-8, at 45. There, Isom and Myers agreed that Isom "would watch on camera and [Myers] would go out to the sales floor and try and get a better view in person." Ex. 8, Belnavis Decl., #73-8, at 45. Myers went to the floor, where he "acted as a shopper and observed"

Page 6 - FINDINGS AND RECOMMENDATION

plaintiff and Jones. *Id.* Although Jones did not notice Myers, plaintiff noticed that he "was getting trailed around the store from the point [he] left the customer service desk." Ex. 2, Engelberg Decl., #49-2, at 77. When plaintiff and Jones returned to the customer-service desk for a second time, Myers left the floor and returned to the loss-prevention office. Ex. 8, Belnavis Decl., #73-8, at 45-47.

When plaintiff and Jones arrived back at the customer-service desk, Smith, the associate that had helped them previously, was not there. Ex. 2, Engelberg Decl., #49-2, at 48. Instead, Tanysha Morris, another Kohl's associate, was at the customer-service desk helping another customer. Camera 1 at 2:40:21. When plaintiff explained to Tanysha Morris what he wanted to exchange, Tanysha Morris "handed the customer over to Jessica" Morris, another Kohl's associate, because she was unsure whether plaintiff could complete his requested exchange. Ex. 9, Belnavis Decl., #73-9, at 18 (internal quotation mark omitted). Plaintiff then explained to Jessica Morris that he wanted to exchange the tangerine Converse shoes he had left at the customer-service counter for the Nike sandals, shorts, and socks. Ex. 3, Belnavis Decl., #73-3, at 14-15. Jessica Morris reviewed the document that plaintiff's principal described as an online receipt and then told plaintiff that she could not exchange the tangerine Converse shoes for the Nike sandals, shorts, and socks because Kohl's "policy is that[,] to do an even exchange, it has to be one item that is exactly the same as the full retail price for the item it is being replaced with." *Id.* at 16, 22-23. Plaintiff responded, "'Okay.'" Ex. 2, Engelberg Decl., #49-2, at 48. At this point, Jones left the customer-service desk to retrieve a pair of red Converse shoes to complete the exchange. Camera 1 at 2:44:35. Plaintiff remained at the customer-service desk for a few seconds but then left to return the Nike sandals to the shelf. *Id.* at 2:44:51. Plaintiff and Jones

returned to the customer-service desk, and Jessica Morris completed the exchange. *Id.* at 2:45:34 to 2:46:35; *see also* Ex. 2, Engelberg Decl., #49-2, at 50. Plaintiff and Jones then left the customer-service desk. Ex. 2, Engelberg Decl., #49-2, at 52.

Meanwhile, in the security office, Isom and Myers continued to watch plaintiff and Jones. Ex. 7, Belnavis Decl., #73-7, at 44; Ex. 8, Belnavis Decl., #73-8, at 46-49. At some point, Isom called the customer-service desk and spoke with Tanysha Morris. Ex. 9, Belnavis Decl., #73-9, at 22. Isom asked Tanysha Morris "what was going on." *Id.* Because plaintiff and Jones were still at the customer-service desk, Isom instructed Tanysha Morris to "run to the back" to use a different phone. *Id.* Once she was on a different phone, Tanysha Morris told Isom that plaintiff had "set up a pair of Converse shoes on the counter, [and] was trying to exchange them for basketball shorts and socks with no receipt." *Id.*; *see also* Ex. 7, Belnavis Decl., #73-7, at 46-47. After plaintiff completed the exchange and walked away from the customer-service desk, Isom also called Jessica Morris. Ex. 3, Belnavis Decl., #73-3, at 25. Isom asked Jessica Morris if she had done an exchange, to which Jessica Morris replied yes, and Isom then hung up the phone. *Id.* at 26. Jessica Morris was not asked to clarify whether it was a "legitimate transaction." *Id.* at 26-27.

After he completed his exchange, plaintiff and Jones walked toward an exit. Ex. D, Klingbeil Decl., #83, at 52. When plaintiff reached the exit, Isom and Myers stopped him. *Id.* at 54-55. There is a factual dispute as to what occurred next. According to plaintiff, Myers said, "'Come with me.'" *Id.* at 56. When plaintiff asked what he had done, Isom responded, "'You know what you did.'" *Id.* Plaintiff alleges that Myers then "grabbed" plaintiff's arm and "forced" plaintiff to go with him. *Id.* at 57. In its account of the facts, Kohl's alleges that Isom

approached plaintiff, identified herself as a loss-prevention officer, and asked plaintiff to accompany her to the security office. Ex. 14, Belnavis Decl., #73-13, at 3. Plaintiff agreed to do so. *Id.* Kohl's denies that Myers touched plaintiff's arm.

Plaintiff, Myers, and Isom then proceeded to the security office. Ex. C, Klingbeil Decl., #64, at 58. Jones trailed behind but did not enter the security office. *Id.* at 58-59. Once inside the office, plaintiff sat in a chair near the door. Ex. A, Klingbeil Decl., #64, at 64. The door was closed but not locked. *Id.* at 64. Plaintiff did not feel free to leave. Ex. C, Klingbeil Decl., #64, at 57. Myers asked plaintiff what he had in his bag and plaintiff responded that he had his shoes in his bag. *Id.* at 60. Plaintiff proceeded to explain that he had come into the store to exchange a pair of shoes he received from his school as an award. *Id.* at 60-61. At this point, Isom indicated that she would investigate plaintiff's claim and left the security office. *Id.* at 61. According to plaintiff's version of events, for approximately the next ten minutes, Myers continued to ask plaintiff questions and, at one point, stated that plaintiff had committed "'exchange fraud.'" *Id.* at 62, 67. Plaintiff alleges that Myers then "got silent" and began looking at the video monitors in the security office. *Id.* at 61, 63-65. After approximately twenty minutes of silence, Myers started talking to plaintiff again. *Id.* at 65, 67. Plaintiff noticed that Myers's "mood changed" and he began talking to plaintiff about sports. *Id.* at 67-68. After another ten minutes, Isom returned to the security office, apologized, explained that they had believed plaintiff committed exchange fraud, and noted that "'this tactic usually works.'" *Id.* at 69. Isom then told plaintiff he was free to leave. *Id.* at 70. Plaintiff then left the security office and took the bus home. *Id.* at 71-72. While Kohl's does not dispute plaintiff's general account of what occurred in the security office, it alleges that plaintiff was in the security office for only ten to fifteen minutes before

Page 9 - FINDINGS AND RECOMMENDATION

leaving the store.

Following the incident, Isom reviewed and preserved the video footage from Camera 10 showing plaintiff as he browsed shoes in the shoe department and selected the Nike sandals, socks, and shorts.  Ex. T, Klingbeil Decl., #39, at 36.  Isom also reviewed and preserved the video footage from Camera 1 showing plaintiff talking with Smith while at the customer-service desk for the first time and talking with Tanysha Morris and Jessica Morris while at the customer-service desk for the second time.  Isom did not preserve the video footage showing plaintiff's entry into the store, his initial walk from the front of the store to the customer-service desk, his walk from the customer-service desk to the shoe department to return the Nike sandals, his initial encounter with Isom and Myers, his walk to the security office, or his exit from the security office and the store.

## PROCEDURAL BACKGROUND

On August 1, 2012, plaintiff filed the instant action against Kohl's, alleging violations of 42 U.S.C. § 1981, 42 U.S.C. § 1982, and Oregon Revised Statute Section 659A.403, as well as claims for false imprisonment, intentional infliction of emotional distress, and battery.[5]  On September 21, 2012, Kohl's filed an answer (#8), denying plaintiff's allegations and asserting various affirmative defenses.

On August 7, 2013, plaintiff filed a motion for imposition of sanctions (#37), requesting that the court sanction Kohl's for its destruction of video-surveillance footage from the date of the incident.  On August 26, 2013, Kohl's filed a resistance to the motion for imposition of

---

[5]  Plaintiff also named Isom and Myers as defendants but thereafter voluntarily dismissed his claims against them, leaving only Kohl's as a defendant.  *See* Notice of Dismissal of Cindy Isom and Ryan Myers, #92, at 1-2.

sanctions (#48).[6]

On October 14, 2013, plaintiff filed a motion for partial summary judgment (#63), requesting that the court grant summary judgment in plaintiff's favor on several of Kohl's affirmative defenses and on plaintiff's false-imprisonment and battery claims.  On November 8, 2013, Kohl's filed a resistance to plaintiff's motion for partial summary judgment (#78).  On November 19, 2013, plaintiff filed a reply in support of his motion for partial summary judgment (#84).

Meanwhile, on October 21, 2013, Kohl's filed its motion for summary judgment (#71).  On November 15, 2013, plaintiff filed a resistance to Kohl's motion for summary judgment (#82).  On November 26, 2013, Kohl's filed a reply in support of its motion for summary judgment (#88).

On December 2, 2013, the undersigned held oral argument on the motions.  At the hearing, plaintiff moved to voluntarily dismiss his claim for intentional infliction of emotional distress, which the court granted.  I find that plaintiff's motion for imposition of sanctions, plaintiff's motion for partial summary judgment, and Kohl's motion for summary judgment are fully submitted and ready for decision.

/ / /

---

[6]  Also on August 26, 2013, plaintiff filed the motion to amend the memorandum in support of the motion for sanction (#52).  In the declaration in support of the motion to amend (#52-1), plaintiff's attorney explains that a Microsoft Word "bug" caused part of footnote 1 in the original motion to be deleted and the amended motion corrects this error by including the full text of footnote 1.  In reviewing plaintiff's original memorandum in support of the motion for imposition of sanctions, it does appear that a portion of footnote 1 is missing.  Accordingly, I find it appropriate to grant plaintiff's motion to amend and shall consider the amended memorandum in support of the motion for imposition of sanctions.

## DISCUSSION

**I.      Plaintiff's Motion for Imposition of Sanctions**

Plaintiff moves the court to sanction Kohl's for its failure to preserve video footage showing plaintiff's entry into the store, his initial walk from the front of the store to the customer-service desk, his walk from the customer-service desk to the shoe department to return the Nike sandals, his initial encounter with Isom and Myers, his walk to the security office, and his exit from the security office and the store.  Plaintiff requests that the court direct a verdict in his favor on liability for each of his claims or, alternatively, enter an order establishing certain facts as true. Plaintiff further "seeks his costs and attorney fees associated with all additional work occasioned by [Kohl's] spoliation in this matter."  Plaintiff's Motion for Imposition of Sanctions, #37, at 44-45.

In response, Kohl's argues that it did not have a duty to preserve the video footage because it erased the footage in the normal course of business and prior to receiving notice of litigation.  Moreover, Kohl's argues that, even if it the court were to determine that Kohl's had a duty to preserve the video footage, the harsh sanctions plaintiff proposes are unwarranted under the circumstances.  Finally, Kohl's contends that it is entitled to fees and costs on the bases that plaintiff's motion for imposition of sanctions is "completely meritless," plaintiff egregiously misrepresents in the motion for imposition of sanctions that Kohl's disposed of two DVRs although plaintiff's counsel was aware at the time he filed the motion that the DVRs were available for inspection, and, furthermore, plaintiff "has engaged in an absolute litany of discovery abuses," including untimely discovery responses.  Kohl's Resistance to Motion for Imposition of Sanctions, #48, at 29-30.

"A federal trial court has the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence." *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993).[7] Thus, a district court has the discretion to impose sanctions based on its power "to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial." *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992) (citation omitted). Sanctions for spoliation include dismissal of claims, exclusion of evidence, and adverse jury instructions permitting a jury to draw an inference that the destroyed evidence would have been adverse to the party responsible for its destruction. *Id.* at 368-70. Before a court imposes the "harsh sanction" of dismissal, "the conduct to be sanctioned must be due to willfulness, fault, or bad faith." *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995) (citation omitted) (internal quotation marks omitted). Even when a court imposes a lesser evidentiary sanction than outright dismissal, it must find that the party willfully destroyed the evidence. *Unigard*, 982 F.2d at 368 & n.2; *Glover*, 6 F.3d at 1329; *see also Akiona v. United States*, 938 F.2d 158, 161 (9th Cir.1991).

A party's destruction of evidence is considered "willful" if the party "has 'some notice that the [evidence was] *potentially* relevant to the litigation before [it was] destroyed.'" *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) (citation omitted). Because the relevance of destroyed evidence cannot clearly be ascertained, a party "can hardly assert any presumption of

---

[7] I note that plaintiff purports to move for sanctions pursuant to Federal Rule of Civil Procedure 37 as well as the court's inherent power. *See* Plaintiff's Motion for Imposition of Sanctions, #37, at 2 ("Plaintiff seeks relief under FRCP 37 and the court's inherent powers to manage this case and discovery."). Plaintiff, however, identifies no discovery order that Kohl's allegedly violated and, thus, I find no basis for imposing sanctions under Rule 37. *See* Fed. R. Civ. P. 37(b)(2) (providing for sanctions when a party "fails to obey an order to provide or permit discovery").

Page 13 - FINDINGS AND RECOMMENDATION

irrelevance" as to the destroyed evidence. *Id.* (quoting *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1205 (8th Cir. 1982)) (internal quotation mark omitted).

Circuit courts describe the duty to preserve evidence as attaching when a party should know that evidence may be relevant to litigation that is "anticipated," or "reasonably foreseeable." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590, 591 (4th Cir. 2001) (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998), *and West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)). As the Federal Circuit recently explained, "[w]hen litigation is 'reasonably foreseeable' is a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry." *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011) (citing *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)). Although "this standard does not trigger the duty to preserve documents from the mere existence of a potential claim or the distant possibility of litigation, . . . it is not so inflexible as to require that litigation be imminent, or probable without significant contingencies." *Id.* (citations omitted) (internal quotation marks omitted). Some district courts in the Ninth Circuit express the standard differently, holding that litigation must be "probable" before the duty to preserve evidence applies. *Realnetworks, Inc. v. DVD Copy Control Ass'n*, 264 F.R.D. 517, 524 (N.D. Cal. 2009); *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1068 (N.D. Cal. 2006).

## A.    When Duty to Preserve Attached

The first step in the spoliation analysis is to determine the point at which Kohl's became obligated to preserve all evidence that might be relevant to reasonably foreseeable future litigation in this matter. Plaintiff argues that Kohl's duty to preserve evidence arose on June 6,

2012—the date of the incident.  Plaintiff contends that such duty arose out of Kohl's internal

policy, which requires an employee to save video footage of a "non-productive incident."

Alternatively, plaintiff argues that the duty attached on June 6, 2012, because the incident itself is

of a type that Kohl's should have reasonably anticipated litigation.[8]  Kohl's counters that it was

not required to preserve evidence before July 18, 2012—the date that it received plaintiff's

demand letter and preservation notice.  Kohl's further argues that the video footage at issue had

been automatically overwritten in the ordinary course of business prior to July 18, 2012.

### 1.    Internal Policy

First, plaintiff argues that Kohl's had an obligation to preserve the video footage because,

under Kohl's loss-prevention policy, an employee must "mark and save all applicable video and

evidence from [a non-productive] incident," Ex. AA, Klingbeil Decl., #38-2, at 9, which is

defined as "a situation where a Loss Prevention Associate detains and/or questions a subject

regarding possession and/or ownership of Kohl's merchandise and the subject is found to either

not be in possession of the merchandise in question or proves proper ownership of said

merchandise," Ex. Y, Klingbeil Decl., #38-2, at 7. In response, Kohl's argues that Isom followed

---

[8]  In the motion for imposition of sanctions, plaintiff also alleges that Kohl's disposed of
the DVRs that would have contained information indicating how long video footage was stored
on the DVRs before being automatically overwritten—information relevant to determining
whether Kohl's had notice of possible litigation at the time the video footage was destroyed.  In
its resistance, Kohl's states that it never disposed of the DVRs and that plaintiff's counsel was
aware that Kohl's had not disposed of the DVRs before he filed the motion for imposition of
sanctions.  Kohl's explains that it replaced the DVRs used on the date of the incident, but that it
located the DVRs and notified plaintiff's counsel, who agreed to have the DVRs analyzed by a
neutral third party.  Plaintiff did not supplement his motion for imposition of sanctions with the
results of such analysis and, accordingly, I will accept Kohl's assertion that video footage stored
on the DVRs was automatically overwritten before Simon Williams, plaintiff's father, contacted
Kohl's to complain about the treatment of his son and before plaintiff served Kohl's with the
demand letter and preservation notice.

Kohl's internal policy by preserving the video footage relevant to plaintiff's suspected exchange

fraud.  *See* Kohl's Resistance to Plaintiff's Motion for Imposition of Sanctions, #48, at 4 ("Ms.

Isom identified and pulled *all* video from June 6, 2012 that she determined was 'applicable' to her

determination that [p]laintiff had committed exchange fraud.").  Moreover, Kohl's argues that a

company's internal policy alone does not create a legal duty to preserve evidence.

First, I disagree with Kohl's that Isom followed the loss-prevention policy when she

selected what video footage to preserve.  While Isom preserved video footage relevant to why

she and Myers believed plaintiff had engaged in exchange fraud, the policy requires a loss-

prevention officer to preserve all "applicable video and evidence from *the incident*," which

ostensibly includes not only video footage relevant to why the loss-prevention officer targeted an

individual but also the actual incident itself—that is, the point at which the loss-prevention

officer stops and questions the individual.  This is consistent with the presumable purpose of

preserving video footage of a non-productive incident, which is to assist Kohl's in the event that

the victim of the non-productive incident sues.  The types of lawsuits that would arise out of a

non-productive incident could include, for example, a false-imprisonment claim, thus suggesting

that Kohl's policy requires a loss-prevention officer to keep video footage of the actual encounter

between the loss-prevention officer and the subject.  In sum, Kohl's did not keep all of the video

footage it should have kept under its policy; at a minimum, Kohl's should have preserved the

video footage showing plaintiff's detention and his exit from the security office and store.

Nevertheless, while I find that Kohl's violated its own policy requiring it to keep video

footage of non-productive incidents, I disagree with plaintiff that a company has a legal

obligation to retain video footage on the basis of an internal policy.  In support of his argument,

Page 16 - FINDINGS AND RECOMMENDATION

plaintiff relies on *Matteo v. Kohl's Department Stores, Inc.*, No. 09 Civ. 7830 (RJS), 2012 WL 760317, at *3 (S.D.N.Y. Mar. 6, 2012), *aff'd on other grounds*, 533 F. App'x 1 (2d Cir. 2013), a slip-and-fall case.  In *Matteo*, Kohl's failed to preserve video footage of the plaintiff's fall in violation of company policy.  *Id.*  The District Court for the Southern District of New York held that, because Kohl's was aware that plaintiff had been injured, it should have reasonably anticipated litigation.  *Id.*  The court in *Matteo* noted that such an obligation was consistent with Kohl's internal policy.  *Id.*  The court, however, did not suggest that the obligation to preserve the video footage arose out of the internal policy.  Rather, the internal policy merely reflected the fact that there is a reasonable likelihood of litigation when a slip and fall occurs on a business's property.

While not directly on point, *Johnson v. Liberty Mutual Fire Insurance Co.*, 648 F.3d 1162 (10th Cir. 2011), provides some guidance.  In *Johnson*, Johnson was involved in an automobile accident.  *Id.* at 1163.  The other driver claimed that the accident was a result of Johnson's tail lights not working.  *Id.*  Johnson's insurance company, Liberty Mutual, had the tail lights tested, which revealed that they were working.  *Id.*  Based on this evidence, Liberty Mutual was able to fend off liability claims and get the other driver's insurance company to pay for the damage to Johnson's automobile.  *Id.*  Four years after the accident, Johnson sued the other driver for personal injuries arising out of the accident.  *Id.* at 1163-64.  Johnson requested that Liberty Mutual return the tail lights, but Liberty Mutual had already disposed of them.  *Id.* at 1164.  Johnson sued Liberty Mutual for spoliation, arguing that Liberty Mutual violated its own internal policy by not preserving the tail lights for six years.  *Id.* at 1165.  The Tenth Circuit Court of Appeals rejected Johnson's argument:

Page 17 - FINDINGS AND RECOMMENDATION

> [Johnson] point[s] out that Liberty Mutual had an internal policy
> requiring it to preserve the tail lights for six years after closing its
> claims file—in time for [Johnson] to use the lights in [his]
> affirmative litigation.  But this line of argument conflates two very
> different things.  When you violate a corporate policy you may well
> be in trouble with your boss, but that doesn't necessarily mean you
> have committed a tort.  Our role as a court of law is not to enforce
> private corporate policy but to assess public legal liability. . . .
> [Johnson] never explain[s] how Liberty Mutual's adoption of an
> internal retention policy establishes that it did foresee or should
> have foreseen [his] not yet mentioned (and perhaps not yet formed)
> plan to bring an affirmative lawsuit.

*Id.*

I agree with the Tenth Circuit's analysis in *Johnson*.  Although Kohl's may have violated its internal policy by failing to preserve all of the relevant video footage from the incident, this alone cannot serve as a basis for a spoliation sanction.  In other words, a company's internal policy, by itself, does not create a legal duty to preserve evidence.  However, as both *Matteo* and *Johnson* suggest, a company's internal policy may reflect that a certain type of incident is likely to give rise to litigation, as discussed next.

### 2.    Nature of Incident

Even if Kohl's did not have a duty to preserve the video footage based solely on its internal policy, Kohl's nevertheless had a duty to preserve evidence if the incident itself was of a type that Kohl's should have reasonably anticipated litigation.  Courts have routinely found that a defendant is on notice of possible litigation simply by virtue of the fact that an accident occurred on the premises.  *See Simoes v. Target Corp.*, No. 11 CV 2032 (DRH) (WDW), 2013 WL 2948083, at *3 (E.D.N.Y. June 14, 2013) (finding that the obligation to preserve videotape in a slip-and-fall case arose at the time of the accident); *Slovin v. Target Corp.*, No. 12 CV 863 (HB),

2013 WL 840865, at *3 (S.D.N.Y. Mar. 7, 2013) (same); *Matteo*, 2012 WL 760317, at *3

(same); *Aiello v. Kroger Co.*, No. 2:08-cv-01729-HDM-RJJ, 2010 WL 3522259, at *3 (D. Nev.

Sept. 1, 2010) (same); *see also Stevenson v. Union Pacific R.R. Co.*, 354 F.3d 739, 747-48 (8th

Cir. 2004) (finding that Union Pacific had a duty to preserve audio recordings of a conversation

between the conductor and dispatch shortly before a train derailment because there was a

reasonable probability that litigation would result from the accident).

In this case, while plaintiff did not suffer any readily apparent injuries, as in a slip-and-

fall case, Kohl's was on notice of probable litigation due to the nature of the incident.  There is no

dispute that Kohl's employees detained a thirteen year old for alleged exchange fraud but did not

find any evidence that the thirteen year old committed any crime.  Kohl's may not have foreseen

all of the claims that plaintiff is now bringing, such as the claims of racial profiling, but Kohl's

could reasonably foresee litigation relating to, for example, false imprisonment.  This is

consistent with Kohl's internal policy to retain footage of non-productive incidents.  Indeed,

throughout the discussion of non-productive incidents in the policy manual, Kohl's repeatedly

stresses that non-productive incidents expose Kohl's to possible litigation.  *See, e.g.*, Ex. AA,

Klingbeil Decl., #38-2, at 9.

Thus, in light of the foregoing, I find that Kohl's was on notice as of the date of the

incident that litigation was probable.  Accordingly, Kohl's had a duty to preserve all video

footage relevant to reasonably foreseeable claims, such as a false-imprisonment claim.  This

includes video showing Isom and Myers stopping plaintiff, their walk to the security office, and

plaintiff's exit from the security office and the store.  Kohl's, however, was not obligated to

preserve video footage showing plaintiff's entry into the store, his initial walk from the front of

Page 19 - FINDINGS AND RECOMMENDATION

the store to the customer-service desk, and his walk from the customer-service desk to the shoe
department to return the Nike sandals.  Given the types of claims Kohl's could reasonably
anticipate, those portions of the video were not relevant.

### B.    Appropriate Sanction

Having determined that Kohl's had a duty to preserve video footage of plaintiff's initial
encounter with Isom and Myers, their walk to the security office, and plaintiff's exit from the
security office and store, I now turn to consider the appropriate sanction under the circumstances.
Plaintiff requests that the court enter a directed verdict finding Kohl's liable for each of plaintiff's
claims or, alternatively, an order establishing certain facts as true.[9]  Kohl's responds that the harsh
dispositive sanctions plaintiff requests are unwarranted under the circumstances, particularly
where Kohl's did not engage in any deliberately deceptive conduct.

As noted above, before a court imposes a dispositive sanction, "the conduct to be
sanctioned must be due to willfulness, fault, or bad faith."  *Anheuser-Busch*, 69 F.3d at 348
(citation omitted) (internal quotation marks omitted).  In addition, a district court should consider
the following factors: "'(1) the public's interest in expeditious resolution of litigation; (2) the
court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the
public policy favoring disposition of cases on their merits; and (5) the availability of less drastic

---

[9]  Specifically, plaintiff requests that the court enter an order establishing the following as
true: (1) that Kohl's began surveilling plaintiff "immediately when he entered the store"; (2) that
Myers "grabbed" plaintiff's arm and that "no valid justification existed for that action"; (3) that
Isom and Myers did not maintain "'continuous observation'" of plaintiff and, "therefore[,] had no
justification to apprehend him under . . . Kohl's policies"; and (4) that Isom and Myers detained
plaintiff "for at least 45 minutes during questioning."  Plaintiff's Motion for Imposition of
Sanctions, #37, at 42.

sanctions.'" *Leon*, 464 F.3d at 958 (quoting *Anheuser-Busch*, 69 F.3d at 348).[10]  "[T]he district

court need not make explicit findings regarding each of these factors." *Id.* (citing *United States*

*ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co.*, 857 F.2d 600, 603 (9th Cir. 1988)).  "Because

the first two factors generally favor imposing sanctions, and the fourth factor generally cautions

against [dispositive sanctions], 'the key factors [in determining whether to dismiss a case based

on spoliation] are prejudice and the availability of lesser sanctions.'" *Woodard v. Ford Motor*

*Co.*, No. 1:11-cv-3092-CL, 2013 WL 3024828, at *3 (D. Or. June 13, 2013) (second alteration in

original) (quoting *Wanderer v. Johnston*, 910 F.2d 652, 656 (9th Cir. 1990)).

In this case, I have already found that Kohl's acted willfully when it failed to preserve

video footage of plaintiff's initial encounter with Isom and Myers, his walk to the security office,

and his exit from the security office and store.  That is, Kohl's was under a duty to preserve

evidence before the video footage was automatically overwritten on the DVRs.  *See Leon*, 464

F.3d at 959 (finding that destruction is willful if the destroying party had notice that the evidence

was potentially relevant to the litigation).

---

[10]  In *Halaco Eng'g Co. v. Costle*, 843 F.2d 376 (9th Cir. 1988), the Ninth Circuit
articulated a different test, finding that the district court should consider:

> (1) the existence of certain extraordinary circumstances, (2) the
> presence of willfulness, bad faith, or fault by the offending party,
> (3) the efficacy of lesser sanctions, (4) the relationship or nexus
> between the misconduct drawing the dismissal sanction and the
> matters in controversy in the case, and finally, as optional
> considerations where appropriate, (5) the prejudice to the party
> victim of the misconduct, and (6) the government interests at stake.

*Id.* at 380.  More recent cases, however, have applied the slightly different five-factor test
outlined in *Anheuser-Busch* and *Leon*.  *See, e.g.*, *Volcan Grp., Inc. v. Omnipoint Commc'ns, Inc.*,
No. 12-35217, 2014 WL 68488, at *1 (9th Cir. Jan. 9, 2014).  Because the two tests have largely
overlapping considerations, I find it is of no consequence which test I apply in this case.

Furthermore, I find that Kohl's failure to preserve the video footage impairs plaintiff's ability to prove his case. Two significant factual disputes in the case are whether Myers "grabbed" plaintiff's arm on the way to the security office and how long plaintiff was in the security office. While plaintiff can certainly testify as to his version of events, the deleted video footage would have provided objective evidence on these issues. Accordingly, I find that plaintiff is prejudiced by Kohl's failure to preserve the evidence. *See id.* ("The prejudice inquiry 'looks to whether the [spoiling party's] actions impaired [the non-spoiling party's] ability to go to trial or threatened to interfere with the rightful decision of the case.'" (alterations in original) (quoting *Wiltec Guam*, 857 F.2d at 604)).

Nevertheless, while I find that Kohl's acted willfully and that plaintiff's case is harmed by Kohl's failure to preserve evidence, I find that a less severe sanction than those plaintiff proposes suffices under the circumstances. Specifically, I recommend that the district court give an adverse-inference instruction establishing a rebuttable presumption that the deleted video footage would have shown that Myers grabbed plaintiff's arm and that plaintiff was detained in the security office for forty-five minutes. *See Brodle v. Lochmead Farms, Inc.*, No. 10-6386-AA, 2011 WL 4913657, at *5 (D. Or. Oct. 13, 2011) ("A court may 'permit a jury to draw an adverse inference from the destruction or spoliation against the party or witness responsible for that behavior.'" (quoting *Glover*, 6 F.3d at 1329)); *see also Akiona*, 938 F.2d at 160-61 (discussing adverse-inference instructions as a spoliation sanction). Kohl's, of course, will still have the opportunity to rebut that presumption by offering evidence that Myers did not touch plaintiff and that plaintiff was detained for only ten to fifteen minutes.

/ / /

Page 22 - FINDINGS AND RECOMMENDATION

### C.    Summary

Based on the foregoing, plaintiff's motion for imposition of sanctions should be granted in part and denied in part.  I find that Kohl's had a duty to preserve video footage showing Isom and Myers stopping plaintiff, their walk to the security office, and plaintiff's exit from the security office and store, and I recommend that district court give an adverse-inference instruction creating a rebuttable presumption that Myers grabbed plaintiff's arm and that plaintiff was detained for forty-five minutes.[11]

## II.    Motions for Summary Judgment

### A.    Standard

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment is not proper if material factual issues exist for trial. *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).  The substantive law governing a claim or defense determines whether a fact is material. *See*

---

[11]  I note that plaintiff also requests attorneys' fees, although he fails to cite any law in support of his request.  "Under its 'inherent powers,' a district court may . . . award sanctions in the form of attorneys' fees against a party or counsel who acts 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Leon*, 464 F.3d at 961 (quoting *Primus Auto. Fin. Servs., Inc. v. Bartarse*, 115 F.3d 644, 648 (9th Cir. 1997)).  "A party 'demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order.'" *Id.* (quoting *Primus Auto.*, 115 F.3d at 649).  Here, plaintiff has failed to demonstrate that Kohl's acted in bad faith.  While the need to file a motion for imposition of sanctions certainly delayed litigation, plaintiff's counsel's own conduct in including in the motion various allegations regarding Kohl's disposal of the DVRs even though counsel was aware that Kohl's had located the DVRs exacerbated the delay.  Thus, plaintiff's request for monetary sanctions should be denied.

*Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).  In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party and may neither make credibility determinations nor perform any weighing of the evidence.  *See, e.g.*, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990).

### B.    Kohl's Motion for Summary Judgment

Kohl's contends that it is entitled to summary judgment on plaintiff's claims for battery and false imprisonment, as well as plaintiff's racial-discrimination claims arising under 42 U.S.C. § 1981, 42 U.S.C. § 1982, and Oregon Revised Statute Section 659A.403.  Before turning to Kohl's substantive arguments, I will first address plaintiff's evidentiary objections.

### 1.    Plaintiff's Evidentiary Objections

Plaintiff requests that the court "strike" Kohl's statement that loss-prevention officer Isom was raised by an African American father and adopted an African American son.  I have not considered these facts in my resolution of Kohl's motion for summary judgment.  Plaintiff also requests that the court "strike" Kohl's statements that Myers did not grab plaintiff's arm and that Isom and Myers detained plaintiff for less than forty-five minutes.  Because I view the evidence in the light most favorable to plaintiff for the purposes of resolving Kohl's motion for summary judgment, I will assume that Myers grabbed plaintiff's arm and that plaintiff was detained for forty-five minutes.

### 2.    Battery and False-Imprisonment Claims

First, Kohl's requests that the court grant summary judgment in its favor on plaintiff's battery and false-imprisonment claims.  Specifically, Kohl's argues that it is entitled to merchant

immunity under Oregon Revised Statute Section 131.655 because Isom and Myers had probable cause to believe that plaintiff committed exchange fraud and the detention occurred in a reasonable manner and for a reasonable time.  Plaintiff responds that Isom and Myers did not have probable cause and, even if they did, Myers's act of grabbing plaintiff's arm was unreasonable because plaintiff was compliant and, moreover, the length of the detention was unreasonable given that Isom and Myers determined plaintiff had not committed exchange fraud within the first three to five minutes of plaintiff's detention.

Oregon Revised Statute Section 131.655(2) provides:

> Probable cause is a defense to any civil or criminal action based on detention and interrogation that a person brings against . . . [a] merchant or merchant's employee who has detained the person in a reasonable manner and for a reasonable time based on probable cause for believing that the person has committed theft of property of a store or other mercantile establishment . . . .

Or. Rev. St. § 131.655(2).  Thus, to establish that it is entitled to merchant immunity, Kohl's must first establish that Isom and Myers had probable cause to detain plaintiff.  Even if Isom and Myers had probable cause, Kohl's must still show that the detention was reasonable in manner and time.

### a.    Probable Cause

Kohl's maintains that Isom and Myers had probable cause to believe that plaintiff committed exchange fraud.  Specifically, Kohl's alleges that Isom and Myers were unaware that plaintiff brought in a pair of Converse shoes and left them at the customer-service desk.  Isom and Myers then observed plaintiff select merchandise—Nike sandals, socks, and shorts—which he took to the customer-service desk.  Isom and Myers next observed Jones, on behalf of

plaintiff, return to the shoe department, select another pair of shoes, and return to the customer-service desk.  Isom then called the customer-service desk and verified that Jessica Morris, the customer-service associate, had completed an exchange for plaintiff.  Kohl's argues that, under these circumstances, Isom and Myers had an objectively reasonable and good-faith belief that plaintiff had committed exchange fraud, even though they were ultimately mistaken.

Plaintiff responds that Isom and Myers did not have probable cause for two reasons. First, plaintiff contends that, under general agency principles, Jessica Morris's knowledge that plaintiff's transaction was legitimate must be imputed to Isom and Myers.  That is, plaintiff argues that, because Isom and Myers knew that the customer-service associates (primarily Jessica Morris) had first-hand knowledge of the transaction and because Isom and Myers had the opportunity to inquire as to the legitimacy of the transaction, Jessica Morris's knowledge that plaintiff had brought in the pair of tangerine Converse shoes must be imputed to Isom and Myers. Second, plaintiff argues that, even if the court were to find such imputation of knowledge inappropriate, Isom and Myers did not have probable cause to believe that plaintiff committed exchange fraud for the simple reason that plaintiff returned the Nike sandals to the store shelf, as evidenced by the footage from Camera 1.  If Isom and Myers were continuously watching plaintiff, as they claim, then they would have seen plaintiff return the Nike sandals and, thus, plaintiff would have had no Kohl's merchandise to exchange for the red Converse shoes.

Oregon Revised Statute Section 131.655(2) does not define probable cause.  "In the criminal context, probable cause 'means that there is a substantial objective basis for believing that more likely than not an offense has been committed and a person to be arrested has committed it.'"  *Gaines v. Nordstrom, Inc.*, Civil No. 06-1612-HA, 2007 WL 2984054, at *3 (D.

Or. Oct. 9, 2007) (quoting Or. Rev. St. § 131.005(11)).  There are two components to the

probable-cause analysis in the criminal context: first, an officer "must subjectively believe that a

crime has been committed" and, second, "this belief must be objectively reasonable in the

circumstances."  *Id.* (citation omitted) (internal quotation mark omitted).  "Whether probable

cause exists to believe that a person has committed theft of a merchant's property is a question of

law if the facts are undisputed.  If the facts are disputed, the court submits the evidence to the

jury with instructions about what probable cause requires."  *Buckel v. Nunn*, 891 P.2d 16, 22 (Or.

Ct. App. 1995); *accord Dow v. Sears, Roebuck & Co.*, 734 P.2d 1387, 1391 (Or. Ct. App. 1987).

Here, there is no dispute as to the relevant facts and, thus, the court must decide whether

probable cause existed as a matter of law.  Although this presents a close question, I find that

Isom and Myers did not have probable cause to believe that plaintiff committed exchange fraud.

I find it unnecessary to determine whether Jessica Morris's knowledge that the transaction was

legitimate should be imputed to Isom and Myers.  Rather, based on the facts known to Isom and

Myers, there was no objectively reasonable basis from which to conclude that plaintiff had

committed exchange fraud.  First, Isom and Myers assumed, without any evidence, that plaintiff

brought no merchandise into the store to exchange.  Although Isom called both Tanysha Morris

and Jessica Morris at the customer-service desk, she failed to ask whether the transaction was

legitimate or, more specifically, whether plaintiff had entered the store with any merchandise to

exchange.  Second, as plaintiff argues, Isom and Myers both reported that, based on their

continuous observation of plaintiff, they believed he was attempting to exchange one pair of

shoes for another pair of shoes, both of which plaintiff and Jones had taken from the shoe

department.[12]  *See* Ex. I, Belnavis Decl., #73-15, at 3.  However, the store surveillance video clearly shows that after Jessica Morris told plaintiff how to complete an "even exchange," plaintiff returned the Nike sandals to the shoe department while Jones retrieved the red Converse shoes.  Thus, at the time of the exchange, of the two pairs of shoes Isom and Myers witnessed plaintiff and Jones take to the customer-service desk, only one pair (the red Converse shoes) remained.  An objectively reasonable person could not believe that plaintiff had committed exchange fraud under these circumstances.

Based on the foregoing, I find that Isom and Myers did not have probable cause to believe that plaintiff committed exchange fraud and, thus, the Oregon merchant-immunity statute is inapplicable.  Consequently, I recommend that the district court deny Kohl's motion for summary judgment to the extent it seeks summary judgment on plaintiff's battery and false-imprisonment claims based on Oregon's merchant-immunity statute.

### b.    Unreasonable detention

Even if Isom and Myers had probable cause, however, Kohl's must still establish that the detention was reasonable.  *Campbell v. Safeway, Inc.*, 332 F. Supp. 2d 1367, 1373 (D. Or. 2004) ("Under Oregon's merchant exception, . . . the existence of probable cause does not inherently shield the merchant from tort liability; the confinement also must have been consummated in a 'reasonable manner and for a reasonable time.'" (citation omitted))  "Whether the confinement was reasonable in manner and time is an issue for the jury unless the court determines that, even 'accepting the evidence most favorable to plaintiff, the detention was reasonable.'"  *Id.* (quoting

---

[12]   Isom and Myers were, apparently, under the impression that plaintiff had taken a pair of Converse shoes, rather than Nike sandals, on his first trip to the customer-service desk.  *See* Ex. I, Belnavis Decl., #73-15, at 2-3.

*Delp v. Zapp's Drug & Variety Stores*, 395 P.2d 137, 140 (Or. 1964)); *accord Buckel*, 891 P.2d at 22.

In this case, according to plaintiff's version of events, Myers grabbed plaintiff's arm and forced plaintiff to accompany Myers and Isom to the security office. Plaintiff did not resist, never indicated that he would not follow Myers and Isom to the office, and was at all times compliant. Under these circumstances, a reasonable jury could conclude that Myers's grabbing of plaintiff's arm was unreasonable. Moreover, once at the security office, plaintiff explained to Myers and Isom that he had received a pair of shoes from his school as an award and that he had exchanged those shoes for a different pair. Isom left the security office to investigate plaintiff's claim. Within three to five minutes after Isom and Myers detained plaintiff, Isom learned that plaintiff had indeed brought in a pair of Converse shoes and that the exchange was a legitimate transaction. Plaintiff, however, remained in the security office for forty-five minutes before Isom told plaintiff that he was free to leave—that is, forty minutes after she learned that plaintiff had not engaged in exchange fraud. Given these facts, a reasonable jury could conclude that the length of the detention was unreasonable.

Accordingly, even if Isom and Myers had probable cause to detain plaintiff—and I find that they did not—there are genuine issues of material fact as to whether the detention was reasonable in manner and time. Thus, Kohl's request for summary judgment on plaintiff's battery and false-imprisonment claims should be denied.

### 2.    Racial-Discrimination Claims

Next, Kohl's moves for summary judgment in its favor on plaintiff's four racial-discrimination claims.

Page 29 - FINDINGS AND RECOMMENDATION

### a.    Right to Contract and Convey Property

First, Kohl's argues that plaintiff has failed to establish a prima facie case under 42 U.S.C. § 1981's right-to-contract clause and under 42 U.S.C. § 1982 because he was not denied the right to contract or the right to purchase property.  Specifically, Kohl's argues that plaintiff was allowed to exchange his tangerine Converse shoes, that Isom and Myers's "unobtrusive surveillance" of plaintiff cannot support a § 1981 or § 1982 action, and that any of Isom and Myers's actions taken after the exchange was completed are irrelevant because they did not interfere with plaintiff's right to contract or his right to purchase property.  Kohl's Memo. in Support of Motion for Summary Judgment, #72, at 23.  Moreover, Kohl's argues that plaintiff has failed to show that similarly situated customers were treated differently or that any Kohl's employee made "overtly hostile statements or [took] actions that a reasonable person would construe to be objectively discriminatory."  *Id.* at 27.

In response, plaintiff argues that Jessica Morris's refusal to exchange plaintiff's tangerine Converse shoes for the Nike sandals, socks, and shorts constitutes a denial of his right to contract and his right to purchase property.  Although plaintiff apparently recognizes that Isom and Myers's detention of plaintiff after the exchange is not relevant to his claims under § 1981's right-to-contract clause and § 1982, plaintiff argues that evidence of Kohl's racially motivated surveillance of plaintiff can be used as indirect evidence of racial discrimination.  Specifically, plaintiff argues that Jessica Morris was in the shoe department surveilling plaintiff, along with Isom and Myers, and that "suspicions raised by the racially-motivated surveillance . . . played a role in [Jessica] Morris'[s] decision to take over the transaction from [Tanysha] Morris, [and] then limit [plaintiff's] exchange options."  Plaintiff's Resistance to Kohl's Motion for Summary

Page 30 - FINDINGS AND RECOMMENDATION

Judgment, #82, at 29.  Finally, plaintiff argues that Kohl's exchange policy demonstrates that other customers would have been offered more comprehensive exchange or return options, including KMC (or store credit), which would have allowed plaintiff to exchange the tangerine Converse shoes for the Nike sandals, shorts, and socks.

Under 42 U.S.C. § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981.  Likewise, 42 U.S.C. § 1982 provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982.  Claims under §§ 1981 and 1982 are evaluated under the *McDonnell Douglas* burden-shifting framework.  *See Lindsey v. SLT L.A., LLC*, 447 F.3d 1138, 1144 (9th Cir. 2006) (applying the *McDonnell Douglas* burden-shifting framework to a § 1981 action); *Phiffer v. Proud Parrot Motor Hotel, Inc.*, 648 F.2d 548, 551 (9th Cir. 1980) (applying the *McDonnell Douglas* burden-shifting framework to a § 1982 action).  Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first establish a prima facie case of racial discrimination. *Lindsey*, 447 F.3d at 1144.  If the plaintiff is able to do so, "the burden shifts to the defendant to prove it had a legitimate non-discriminatory reason for the adverse action.  If the defendant meets that burden, the plaintiff must prove that such a reason was merely a pretext for intentional discrimination." *Id.* (citation omitted).  To establish a prima facie case under § 1981's right-to-contract clause and under § 1982, a plaintiff must prove four elements: (1) he is a "member of a protected class"; (2) he attempted to engage in a protected activity, such as contracting for a service or purchasing personal property; (3) he was denied the right to do so; and (4) he was

"deprived of services while similarly situated persons outside the protected class were not and/or . . . [he] received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory."  *Id*. at 1145 (quoting *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872 (6th Cir. 2001)) (internal quotation mark omitted).[13]

Here, Kohl's acknowledges that plaintiff has satisfied the first two elements; that is, he is a member of a protected class and he attempted to contract for and purchase personal property. Kohl's, however, argues that plaintiff has not satisfied the third and fourth elements. Specifically, Kohl's argues that plaintiff was not denied the right to contract or the right to purchase property because he was allowed to complete the exchange and, furthermore, he has not shown that similarly situated individuals were treated differently or that he received services in a hostile manner.

First, I agree with Kohl's that plaintiff has failed to show that he was denied the right to contract or the right to purchase property.  Kohl's correctly notes that Isom and Myers's stopping and questioning of plaintiff after he completed the exchange did not interfere with plaintiff's right to contract or his right to purchase property.  *See, e.g.*, *Garrett v. Tandy Corp.*, 295 F.3d 94, 101-02 (1st Cir. 2002) (holding that events subsequent to the plaintiff's purchase of goods did not implicate his right to contract); *Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 854 (8th Cir. 2001) (holding that, "once the purchase is completed, no contractual relationship remains"

---

[13]    In the employment-case context, a plaintiff must show that similarly situated persons were treated differently.  However, in *Christian*, the Sixth Circuit held that, "in the context of the denial of services by a commercial establishment," such a requirement is "too rigorous." *Lindsey*, 447 F.3d at 1145 (discussing *Christian*, 252 F.3d at 872).  The Ninth Circuit has never definitively adopted *Christian*'s modification of the fourth element.  Nevertheless, because it will not change the outcome in this case, I will apply the modified fourth element.

and, thus, the fact that store security officers detained the plaintiff after he completed his purchase was irrelevant to his § 1981 right-to-contract action).

Recognizing that Isom and Myers's conduct following his exchange cannot serve as a basis for his § 1981 right-to-contract and § 1982 claims, plaintiff advances a different theory of liability. That is, plaintiff argues that he was subjected to racially-motivated surveillance by Isom, Myers, and Jessica Morris and that, following such surveillance, Jessica Morris limited his exchange options by refusing to exchange the tangerine Converse shoes for the Nike sandals, shorts, and socks. Viewing the facts in the light most favorable to plaintiff, I find this theory to be untenable. Unobtrusive race-based surveillance does not interfere with a plaintiff's right to contract or right to purchase property. *See, e.g.*, *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 472 (8th Cir. 2009) ("Racially biased watchfulness, however reprehensible, does not 'block' a shopper's attempt to contract."). Thus, Jessica Morris's alleged race-based surveillance of plaintiff in the shoe department—an allegation I find no evidence to support—is irrelevant unless plaintiff can show that his right to contract or his right to purchase property was somehow impaired, a showing he is unable to make. Whether this was a receipted exchange or not, plaintiff told Jessica Morris that he wished to "exchange" his tangerine Converse shoes for the Nike sandals, shorts, and socks. Ex. 3, Belnavis Decl., #73-3, at 14-15. When Jessica Morris told plaintiff that, per Kohl's "even exchange" policy, he needed to select one item to exchange rather than three, plaintiff merely said, "'Okay.'" *Id.* at 16; Ex. 2, Engelberg Decl., #49-2, at 48. Plaintiff did not ask what other options he had under the circumstances and he proceeded to exchange the tangerine Converse shoes for red Converse shoes. There is no suggestion in the record that, if plaintiff had asked about store credit or some other means of completing his initial

Page 33 - FINDINGS AND RECOMMENDATION

requested exchange, Jessica Morris would have refused.  Given that plaintiff asked to conduct an exchange and that he was allowed to complete an exchange, I find that plaintiff has failed to show that he was denied the right to contract or the right to purchase property.

Second, even if plaintiff was able to show that his right to contract or his right to purchase property was impaired, I agree with Kohl's that plaintiff has failed to demonstrate that similarly situated customers were treated differently or that he received services in a hostile manner. Plaintiff stated during his deposition that he did not believe any Kohl's employee, other than Isom and Myers—whose conduct is not at issue as to this claim—discriminated against him.  Ex. 2, Engelberg Decl., #49-2, at 72-73.  Jones also testified that he did not feel mistreated by any Kohl's employee other than the loss-prevention officers.  Ex. 11, Belnavis Decl., #73-11, at 98. While plaintiff suggests that Kohl's exchange policy is evidence that other customers would have been offered additional exchange options, he has failed to produce a single example of a customer who requests an "exchange" and is offered options other than an even exchange. Indeed, the only evidence in the record as to the options another customer would be offered is Jessica Morris's testimony that she considered an "even exchange" a customer's best option and, thus, that is what she would "shoot for."  Ex. 3, Belnavis Decl., #73-3, at 36.  Accordingly, even if plaintiff were able to show that his right to contract or purchase property was impaired, I find that he has failed to demonstrate that similarly situated customers were treated differently or that he received services in a hostile manner.

In light of the foregoing, I find that plaintiff has failed to establish a prima facie case under § 1981's right-to-contract clause and under § 1982.  Accordingly, I recommend that the district court grant summary judgment in favor of Kohl's on these claims.

Page 34 - FINDINGS AND RECOMMENDATION

b.        **Full and Equal Benefit**

Kohl's next argues that it is entitled to summary judgment on plaintiff's § 1981 full-and-equal-benefit claim.  Specifically, Kohl's argues that "there is nothing to suggest that [p]laintiff was stopped and questioned by . . . Isom and Myers 'on account of' his race" and that plaintiff has failed to produce any evidence that "a similarly-situated individual would have somehow been treated differently."[14]  Kohl's Memo. in Support of Motion for Summary Judgment, #72, at 28.  In response, plaintiff argues that the video footage from Camera 10, which was positioned to record activities in the shoe department, shows at least twenty non-African American customers with large bags that were not targeted by Isom and Myers and, thus, that he has demonstrated that similarly situated individuals were treated differently.

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall

---

[14]  I note that Kohl's also suggests that the full-and-equal-benefit clause does not apply where the defendant is not a state actor.  *See* Kohl's Memo. in Support of Motion for Summary Judgment, #72, at 21 n.7.  A majority of the circuit courts of appeals that have addressed this issue, however, have concluded that § 1981's full-and-equal-benefit clause applies to private as well as state actors.  *See, e.g., Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003) (holding that a plaintiff could maintain a § 1981 claim alleging that a department store violated her right to the full and equal benefit of the law when a security officer stopped and searched her); *Phillip v. Univ. of Rochester*, 316 F.3d 291, 294-98 (2d Cir. 2003) (finding no state-action requirement for a claim under § 1981's full-and-equal-benefit clause); *see also Green v. Wal-Mart Stores, Inc.*, No. 2:09CV00457 DS, 2010 WL 3260000, at *4 (D. Utah Aug. 18, 2010) (finding that "Section 1981, on its face, explicitly applies to nongovernmental actors" and noting that the only circuit court to find a state-action requirement was relying on "suspect authority"); *Hester v. Wal-Mart Stores, Inc.*, 356 F. Supp. 2d 1195, 1200 (D. Kan. 2005) ("[C]onsistent with the majority of Circuits that have addressed the issue and because a plain reading of subsection (c) indicates that the conduct of private actors is actionable under the 'full and equal benefit' clause of section 1981, this court determines that state action is not a required element of a 'full and equal benefit' claim.").  Although the Ninth Circuit has yet to decide a case discussing the full-and-equal-benefits clause where the defendant is not a state actor, I find the analysis in *Chapman* and *Phillip* persuasive.  Accordingly, I find that there is no state-action requirement for a full-and-equal-benefit claim.

have the same right in every State and Territory . . . . to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981. Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first establish a prima facie case of racial discrimination by demonstrating that he is a member of a protected class, that he was deprived of the full and equal benefit of the laws, and that the defendant's conduct was "motivated by racial discrimination." *See Phillip*, 316 F.3d at 299; *see also Lindsey*, 447 F.3d at 1144. Under the second element, the plaintiff must show "the denial of the benefit of a law or proceeding protecting his or her personal security or a cognizable property right." *Chapman*, 319 F.3d at 832; *see also Green*, 2010 WL 3260000, at *6 (noting that the plaintiff must show "some nexus to a relevant state law or proceeding" (citing *Phillip*, 316 F.3d at 298)). This element may be satisfied where the plaintiff alleges that he or she was falsely imprisoned by a security officer. *See Lewis v. Commerce Bank & Trust*, 333 F. Supp. 2d 1019, 1021 (D. Kan. 2004) (collecting cases); *see also Green*, 2010 WL 3260000, at *6 (finding that the plaintiff's allegation that the defendant detained her in violation of state laws relating to false imprisonment was sufficient to bring her claim "within the purview of" the full-and-equal-benefit clause).

In this case, Kohl's does not appear to dispute that plaintiff has presented prima facie evidence that he is a member of a protected class and that he was denied the benefit of a law or proceeding protecting his personal security. Rather, Kohl's argues that plaintiff has failed to demonstrate racial animus. For the reasons set forth in plaintiff's resistance, I disagree. Specifically, plaintiff persuasively argues that similarly situated individuals were treated differently. That is, Isom and Myers claim that they targeted plaintiff because he was carrying a

large bag and was in the shoe department, which is a "high theft" area.  Plaintiff argues that video-surveillance footage shows many non-African American customers with large bags in the shoe department and that Isom and Myers did not stop and question any of these individuals.  *See Johnson v. OfficeMax, Inc.*, No. CIV 2:11-cv-2578-MCE-JFM (PS), 2011 WL 6141280, at *5 (E.D. Cal. Dec. 9, 2011) (finding that the plaintiff sufficiently alleged racial animus where a store employee asked plaintiff to leave and where the store employee did not ask two other white customers to leave).  Moreover, as set forth above, I find that Isom and Myers did not have probable cause to believe that plaintiff engaged in exchange fraud.  The fact that Isom and Myers nevertheless stopped and questioned plaintiff in violation of Kohl's policy requiring loss-prevention officers to have probable cause lends further support to plaintiff's argument that he was treated differently than other, non-African American customers.  Thus, I find that plaintiff has set forth sufficient evidence of racial discrimination.

Because plaintiff has established a prima facie case of racial discrimination, the burden shifts to Kohl's to proffer a legitimate, non-discriminatory reason for the adverse action.  *See Lindsey*, 447 F.3d at 1144 (discussing the *McDonnell Douglas* burden-shifting framework).  While Kohl's alleges that Isom and Myers stopped and questioned plaintiff because they were operating under the belief—albeit a mistaken belief—that he committed exchange fraud, *see* Kohl's Memo. in Support of Motion for Summary Judgment, #72, at 28, there are triable issues of fact as to whether Kohl's proffered reason for detaining and questioning plaintiff is pretexual.  That is, Isom and Myers did not stop and question other, non-African American customers with large bags in the shoe department and, furthermore, they stopped and questioned plaintiff without probable cause to believe that he had committed exchange fraud.  Under these circumstances, a

Page 37 - FINDINGS AND RECOMMENDATION

reasonable jury could conclude that Kohl's decision to target plaintiff was racially motivated.

In light of the foregoing, I find that there are genuine issues of material fact precluding summary judgment and, accordingly, I recommend that the district court deny Kohl's motion for summary judgment on plaintiff's claim under § 1981's full-and-equal-benefit clause. *Lindsey*, 447 F.3d at 1144 (noting that the Ninth Circuit "has set a high standard for the granting of summary judgment in . . . discrimination cases . . . because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record" (quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996)) (internal quotation marks omitted)).

### c.    Oregon Revised Statute Section 659A.403

Finally, Kohl's moves for summary judgment on plaintiff's Oregon claim for racial discrimination. Oregon's law prohibiting discrimination in places of public accommodation provides:

> [A]ll persons within the jurisdiction of this state are entitled to the full and equal accommodations, advantages, facilities and privileges of any place of public accommodation, without any distinction, discrimination or restriction on account of race, color, religion, sex, sexual orientation, national origin, marital status or age if the individual is 18 years of age or older.

Or. Rev. St. § 659A.403. This includes more than an "outright denial of service." *King v. Greyhound Lines, Inc.*, 656 P.2d 349, 351 (Or. 1982). "It also proscribes serving customers of one race in a manner different from those of another race." *Id.*; *see also Allen v. U.S. Bancorp*, 264 F. Supp. 2d 945, 953 (D. Or. 2003) (bank customer treated differently when asked to remove his sunglasses while white customers were not). Thus, the relevant inquiries under Oregon

Revised Statute Section 659A.403 are "whether [the plaintiff] was treated differently because of his [or her] race and whether that treatment resulted in [the plaintiff] suffering any harm." *Craig v. US Bancorp*, No. Civ. 03-1680-AA, 2004 WL 817149, at *4 (D. Or. Apr. 14, 2004).

For the reasons set forth above with regard to plaintiff's full-and-equal-benefit claim, I find that summary judgment on plaintiff's Oregon law claim is inappropriate. Viewing the evidence in the light most favorable to plaintiff, there are genuine issues of material fact as to whether Isom and Myers stopped and questioned plaintiff on account of his race. Accordingly, I recommend that the district court deny Kohl's motion for summary judgment on plaintiff's claim under Oregon Revised Statute Section 659A.403.

### 3.    Summary

Consistent with the foregoing, I recommend that the district court grant Kohl's motion for summary judgment with respect to plaintiff's claims arising under § 1981's right-to-contract clause and under § 1982. I find that there are genuine issues of material fact precluding summary judgment on plaintiff's battery and false-imprisonment claims and his claims under § 1981's full-and-equal-benefit clause and Oregon Revised Statute Section 659A.403 and, accordingly, summary judgment as to those claims should be denied.

### B.    Plaintiff's Motion for Partial Summary Judgment

### 1.    Affirmative Defenses

Plaintiff moves for summary judgment on Kohl's second, third, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, and fifteenth affirmative defenses. In response, Kohl's argues that plaintiff's motion for partial summary judgment "is actually an improperly brought motion to strike" under Federal Rule of Civil Procedure 12(f) and that such a motion is

untimely.  Kohl's Resistance to Plaintiff's Motion for Partial Summary Judgment, #78, at 3.

Kohl's further argues that the court should deny plaintiff's motion for partial summary judgment

because plaintiff fails to recite the facts in the light most favorable to Kohl's and, rather, "just

baldly state[s], without actually pointing to the record, that Kohl's cannot meet its burden."  *Id.* at

9.  Finally, Kohl's argues that there are genuine issues of material fact with regard to the

challenged affirmative defenses.

### a.    Propriety of Motion for Summary Judgment

First, Kohl's argues that plaintiff's motion for partial summary judgment is, in fact, an

untimely motion to strike under Federal Rule of Civil Procedure 12(f) because: (1) a motion for

summary judgment is an improper vehicle for challenging an affirmative defense, as the United

States District Court for the Western District of Washington found in *Kerzman v. NCH Corp.*,

No. C05-1820JLR, 2007 WL 765202 (W.D. Wash. Mar. 9, 2007); and (2) although plaintiff

claims that his motion is not a Rule 12 motion, he fails to recite the summary-judgment standard

and challenges several of the affirmative defenses on pleading grounds, thereby suggesting he, in

fact, intended to file a Rule 12(f) motion.  Thus, Kohl's contends that the court should construe

plaintiff's motion as a motion to strike under Rule 12(f) and, because such a motion was due

within twenty-one days of service of the answer, the court should deny plaintiff's motion as

untimely.  Kohl's further argues that, if the court were to construe plaintiff's motion as a Rule

12(f) motion, plaintiff fails to satisfy the Rule 12(f) standard.

I find Kohl's argument unavailing.  First, I agree with United States District Court Judge

Ancer Lee Haggerty's analysis in *EEOC v. Fred Meyer Stores, Inc.*, 954 F. Supp. 2d 1104 (D. Or.

2013).  In *Fred Meyer*, Judge Haggerty rejected the argument that "requesting summary judgment

on an affirmative defense is procedurally inappropriate," noting that Federal Rule of Civil

Procedure 56(a) specifically provides that a party may seek summary judgment on a "'claim *or*

*defense*.'" *Id.* at 1112 (quoting Fed. R. Civ. P. 56(a)). Second, although plaintiff fails to recite

the applicable Rule 56(a) standard in his motion and confusingly references Kohl's failure to

adequately plead certain defenses, it is clear that plaintiff intends to seek summary judgment on

the challenged affirmative defenses.

### b.    Failure to Satisfy Initial Summary-Judgment Burden

Second, Kohl's argues that the court should deny plaintiff's motion for partial summary

judgment because plaintiff "ignores [the summary-judgment standard] and intentionally misleads

the Court by selectively citing to portions of the record that are most favorable to him while

completely ignoring contrary testimony in the record." Kohl's Resistance to Plaintiff's Motion for

Partial Summary Judgment, #78, at 6. Kohl's further contends that, as the moving party, plaintiff

must do more than just state that there is no evidence to support an affirmative defense but,

rather, "must still point to specific facts on the record that, when viewed in the light most

favorable to Kohl's, establish that there is no material fact at issue." *Id.* at 8-9. Thus, Kohl's

argues that, because "[p]laintiff has failed to satisfy his initial summary judgment burden," the

court may deny the motion for partial summary judgment. *Id.* at 9 n.13.

While I am mindful of plaintiff's failure to recite the facts in the light most favorable to

Kohl's and his failure to carefully apply the summary-judgment standard to such facts, I find that

denial of plaintiff's motion for partial summary judgment is not warranted on this basis. Instead,

I shall consider whether there are genuine issues of material fact precluding summary judgment

on the challenged affirmative defenses.

Page 41 - FINDINGS AND RECOMMENDATION

### c.    Entitlement to Summary Judgment

#### i.    Merchant-Immunity Defense

Plaintiff first moves for summary judgment on Kohl's seventh (justification), eighth (private arrest), and ninth (lawful investigation of shoplifting) affirmative defenses.  Kohl's responds that each of these defenses relates to Oregon Revised Statute Section 131.655, Oregon's merchant-immunity statute, and that summary judgment is inappropriate because there are genuine issues of material fact with regard to whether Isom and Myers had probable cause to believe that plaintiff committed exchange fraud and with regard to the reasonableness of the detention.

"[W]hether probable cause exists to believe that a person has committed theft of a merchant's property is a question of law if the facts are undisputed."  *Buckel*, 891 P.2d at 22.  In this case, as set forth above, I find that the relevant facts are not in dispute and that Isom and Myers did not have probable cause to believe that plaintiff committed exchange fraud.  Because probable cause is a requirement under Oregon Revised Statute Section 131.655, genuine issues of material fact with regard to the reasonableness of the detention cannot defeat summary judgment on this defense.  Accordingly, I recommend that the district court grant plaintiff's motion for partial summary judgment with regard to Kohl's seventh, eighth, and ninth affirmative defenses.

#### ii.    Consent

Next, plaintiff moves for summary judgment on Kohl's sixth affirmative defense, alleging that plaintiff consented to the detention.  Plaintiff argues that Isom and Myers "commanded" him to accompany them to the security office, that Myers "grabbed" plaintiff's arm, and that, once in the security office, the door was closed and he was never told he was free to leave.  Under these

circumstances, plaintiff argues that Kohl's consent affirmative defense fails as a matter of law.

Kohl's responds that a genuine issue of material fact exists with regard to whether plaintiff

consented to the detention.  Specifically, Kohl's points to Isom's incident report, in which she

stated that she "asked [plaintiff] to come back into the store with me.  He agreed."  Ex. G,

Klingbeil Decl., #64, at 3.  Kohl's further notes that, viewing the facts in the light most favorable

to it, neither Isom nor Myers touched plaintiff and physically forced him to go to the security

office.

For the reasons set forth in Kohl's resistance to the motion for partial summary judgment,

I find that there are genuine issues of material fact precluding summary judgment on Kohl's

consent affirmative defense.  As set forth above in regards to plaintiff's motion for imposition of

sanctions, I recommend that the district court give an adverse-inference instruction establishing a

rebuttable presumption that the deleted video footage would have shown that Myers grabbed

plaintiff's arm and that plaintiff was detained in the security office for forty-five minutes.  If

Kohl's offers evidence to rebut that presumption, however, a reasonable jury could conclude that

Myers did not touch plaintiff's arm and, moreover, the jury could credit Isom's testimony that

plaintiff agreed to accompany her to the security office.  Thus, because genuine issues of material

fact exist, summary judgment on Kohl's sixth affirmative defense should be denied.

### iii.    Defenses Related to Race-Discrimination Claims

Next, plaintiff moves for summary judgment on Kohl's fifth (legitimate non-

discriminatory reasons), thirteenth (provided goods and services equal to others), and fifteenth

(no prima facie case of discrimination) affirmative defenses.  In light of my finding above that

plaintiff has failed to establish a prima facie case under § 1981's right-to-contract clause and

Page 43 - FINDINGS AND RECOMMENDATION

under § 1982, plaintiff's request for summary judgment in his favor on Kohl's thirteenth

affirmative defense, alleging that "Kohl's provided [p]laintiff with access to the goods, services

and premises offered by Kohl's equal to that afforded to others," Amended Answer, #8, ¶ 54, and

his request for summary judgment in his favor on Kohl's fifth and fifteenth affirmative defenses

insofar as they relate to plaintiff's claims under § 1981's right-to-contract clause and under § 1982

should be denied as moot.  Moreover, in light of my finding above that plaintiff has established a

prima facie case of discrimination under § 1981's full-and-equal-benefit clause and Oregon

Revised Statute Section 659A.403, plaintiff's request for summary judgment in his favor on

Kohl's fifteenth affirmative defense insofar as it relates to those claims should be granted.  As I

found above, however, there are triable issues of fact with regard to Kohl's proffered legitimate,

non-discriminatory reasons for its actions and, thus, plaintiff's request for summary judgment in

his favor on Kohl's fifth affirmative defense insofar as it relates to plaintiff's claims under

§ 1981's full-and-equal-benefit clause and Oregon Revised Statute Section 659A.403 should be

denied.

### iv.    Vicarious Liability/Acting Outside of Employment

Next, plaintiff requests that the court grant summary judgment in his favor on Kohl's

tenth and eleventh affirmative defenses, which allege that, "[t]o the extent that [p]laintiff was

targeted because of his race or any other unlawful reason," Kohl's employees were acting outside

the scope of their employment and Kohl's is not vicariously liable.  Amended Answer, #8, ¶ 51.

Plaintiff contends that these affirmative defenses fail as a matter of law because "the acts at issue

occurred substantially within the time and space limits authorized by the employment," Isom and

Myers's actions were "motivated at least partially to serve Kohl's interests," and detaining and

questioning suspected shoplifters is part of Isom and Myers's duties as loss-prevention officers. Plaintiff's Motion for Partial Summary Judgment, #63, at 24-25.  Accordingly, plaintiff maintains that there is no genuine issue of material fact with regard to whether Isom and Myers were acting outside the scope of their employment and, therefore, he is entitled to summary judgment on Kohl's tenth and eleventh affirmative defenses.  Kohl's responds that summary judgment on these affirmative defenses is premature and, moreover, that these affirmative defenses "go to the issue of punitive damages," an issue plaintiff did not brief.  Kohl's Resistance to Plaintiff's Motion for Partial Summary Judgment, #78, at 31.

"Under the doctrine of *respondeat superior*, an employer is vicariously liable for an employee's tortious conduct when the employee acts within the course and scope of employment."  *Vinsonhaler v. Quantum Residential Corp.*, 73 P.3d 930, 932 (Or. Ct. App. 2003). In determining whether an employee acted outside of the scope of his or her employment, there are three relevant factors: (1) "whether the act in question is of a kind [the employee] was hired to perform," (2) "whether the act occurred within the authorized time and space"; and (3) "whether the employee was motivated, at least in part, by a purpose to serve the employer." *Brungardt v. Barton*, 685 P.2d 1021, 1023 (Or. Ct. App. 1984); *accord Vinsonhaler*, 73 P.3d at 932-33 (citing *Chesterman v. Barmon*, 753 P.2d 404, 406 (Or. 1988)).  "Except in cases where only one reasonable conclusion can be drawn from the facts, it is a question of fact for the jury to determine whether an act committed by an employee is within the scope of employment." *Thomas v. Parker Refrigerated Servs., Inc.*, 657 P.2d 692, 695 (Or. Ct. App. 1983); *accord Brungardt*, 685 P.2d at 1023.

Here, there is no dispute that Isom and Myers's duties as loss-prevention officers included

apprehending suspected shoplifters and that the actions in question occurred in Kohl's department store during normal working hours.  Thus, I find that the first two factors are satisfied.  With regard to the third factor, there is no suggestion in the record that Isom and Myers stopped plaintiff for the sole purpose of annoying, harassing, or embarrassing him.  Rather, in connection with its arguments relating to its merchant-immunity defense, Kohl's acknowledges that Isom and Myers detained plaintiff because they suspected him of committing exchange fraud.  Thus, I find that Isom and Myers's actions were motivated, at least in part, by a purpose to serve Kohl's. Accordingly, I agree with plaintiff that Isom and Myers did not act outside of the scope of their employment.  Nevertheless, while I find that Kohl's may be liable for actual damages, plaintiff did not respond to Kohl's argument that it cannot be held liable for punitive damages under a vicarious-liability theory.  As plaintiff did not brief this issue, summary judgment on Kohl's tenth and eleventh affirmative defenses, insofar as they relate to Kohl's liability for punitive damages, should be denied.

### v.    Good Faith

Plaintiff next moves for summary judgment on Kohl's twelfth affirmative defense, which states, "Kohl's acted in good faith and without malice, reckless disregard of [p]laintiff's rights, or unlawful intent."  Amended Answer, #8, ¶ 53.  In his motion, plaintiff appears to assume that this defense relates to Kohl's argument that Isom and Myers had probable cause to believe that plaintiff committed exchange fraud.  Plaintiff contends that, even if Isom and Myers had a subjective, good-faith belief that plaintiff committed exchange fraud, such belief must be objectively reasonable.  Kohl's responds that its good-faith defense relates not only to its merchant-immunity defense but also its argument that it had legitimate, non-discriminatory

reasons for stopping plaintiff.

Summary judgment is not appropriate on Kohl's twelfth affirmative defense. To the extent such defense relates to Kohl's merchant-immunity defense, I have already concluded that Isom and Myers did not have probable cause to believe that plaintiff committed exchange fraud and, thus, any good-faith defense is inapplicable. However, to the extent Kohl's is asserting its good-faith defense in relation to its argument that Isom and Myers did not stop and question plaintiff on account of his race, I have already found above that there are genuine issues of material fact with regard to whether Kohl's had a legitimate, non-discriminatory reason for stopping plaintiff. Accordingly, summary judgment on Kohl's twelfth affirmative defense should be denied.

### vi.    Estoppel and Waiver

Finally, plaintiff moves for summary judgment on Kohl's second affirmative defense, alleging estoppel, and third affirmative defense, alleging waiver. Kohl's did not respond to plaintiff's arguments regarding these affirmative defenses and, viewing the evidence in the light most favorable to Kohl's, I find that there are no facts in the record suggesting plaintiff made any false representation or intentionally relinquished any right. *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) ("Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case. Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial." (citation omitted)). Accordingly, because there are no genuine issues of material fact with regard to the applicability of an estoppel or waiver defense, plaintiff's motion for summary judgment on

Page 47 - FINDINGS AND RECOMMENDATION

Kohl's second and third affirmative defenses should be granted.

### 2.    False-Imprisonment and Battery Claims

Plaintiff also moves for summary judgment on his claims for false imprisonment and battery. The tort of false imprisonment has four elements: "(1) defendant must confine plaintiff; (2) defendant must intend the act that causes the confinement; (3) plaintiff must be aware of the confinement; and (4) the confinement must be unlawful." *Hiber v. Creditors Collection Serv. of Lincoln Cnty., Inc.*, 961 P.2d 898, 901 (Or. Ct. App. 1998). "In Oregon, a plaintiff in a false imprisonment action must *reasonably* believe that he or she has been detained." *Leiseth v. Fred Meyer, Inc.*, 57 P.3d 914, 917 (Or. Ct. App. 2002). Consent is a defense to a claim of false imprisonment. *See Roberts v. Coleman*, 365 P.2d 79, 82 (Or. 1961). The tort of battery has three elements: (1) the defendant must commit a voluntary act; (2) the act must result in harmful or offensive contact; and (3) the defendant must have intended to cause the harmful or offensive contact. *See Ballard v. City of Albany*, 191 P.3d 679, 640-41 (Or. Ct. App. 2008).

Here, there are genuine issues of material fact precluding summary judgment on these claims. Specifically, viewing the facts in the light most favorable to Kohl's, a reasonable jury could conclude that plaintiff consented to the confinement or that he did not reasonably believe that he had been detained. That is, a jury could credit Isom's testimony that she asked plaintiff to accompany her to the security office and that he agreed to do so. With regard to the battery claim, Kohl's disputes that Myers touched plaintiff's arm. As set forth above in regard to plaintiff's motion for imposition of sanctions, I recommend that the district court give an adverse-inference instruction establishing a rebuttable presumption that the deleted video footage would have shown that Myers grabbed plaintiff's arm; however, if Kohl's offers evidence to rebut that

presumption, a reasonable jury could conclude that Myers did not touch plaintiff's arm. Accordingly, plaintiff's motion for summary judgment on his false-imprisonment and battery claims should be denied.

### 3.    Summary

Consistent with the foregoing, I recommend that the district court grant plaintiff's motion for summary judgment on Kohl's second, third, seventh, eighth, and ninth affirmative defenses, deny plaintiff's motion for summary judgment on Kohl's fifth, sixth, twelfth, and thirteenth affirmative defenses, and grant in part and deny in part plaintiff's motion for summary judgment on Kohl's tenth, eleventh, and fifteenth affirmative defenses. I further recommend that the district court deny plaintiff's motion for summary judgment on his battery and false-imprisonment claims.

## CONCLUSION

For the reasons set forth above, plaintiff's motion to amend the memorandum in support of the motion for imposition of sanctions (#52) is granted and the district court should grant in part and deny in part plaintiff's motion for imposition of sanctions (#37), grant in part and deny in part plaintiff's motion for partial summary judgment (#63), and grant in part and deny in part defendant's motion for summary judgment (#71).

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a

Page 49 - FINDINGS AND RECOMMENDATION

copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings

and Recommendation will go under advisement.


Dated this 31st day of March, 2014.


    /s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge